**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-1339**

_____

NATHANIEL HICKS,

                    Plaintiff - Appellee,

       v.

OFFICER GERALD L. FERREYRA, in his individual capacity; OFFICER BRIAN A. PHILLIPS, in his individual capacity,

                    Defendants - Appellants.

_____

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, Senior District Judge. (8:16−cv−02521−PWG)

_____

Argued: January 27, 2023                              Decided: March 29, 2023

_____

Before HARRIS, Circuit Judge, and MOTZ and KEENAN, Senior Circuit Judges.

_____

Affirmed by published opinion. Senior Judge Keenan wrote the opinion, in which Judge Harris and Senior Judge Motz joined.

_____

**ARGUED:** Edward P. Parent, SILVERMAN, THOMPSON, SLUTKIN & WHITE, Baltimore, Maryland, for Appellants. Yiyang Wu, RELMAN COLFAX PLLC, Washington, D.C., for Appellee. **ON BRIEF:** Andrew C. White, Jodie E. Buchman, SILVERMAN, THOMPSON, SLUTKIN & WHITE, Baltimore, Maryland, for Appellants. Gemma Donofrio, RELMAN COLFAX PLLC, Washington, D.C., for Appellee.

_____

BARBARA MILANO KEENAN, Senior Circuit Judge:

Nathaniel Hicks, a now-retired Special Agent with the United States Secret Service, filed a civil suit against two United States Park Police officers, Gerald Ferreyra and Brian Phillips, under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Hicks asserted that the officers violated Hicks's rights under the Fourth Amendment by unlawfully seizing him during two traffic stops. A jury found the officers liable for Hicks's emotional injuries resulting from the constitutional violations and awarded Hicks a total of $205,000 in compensatory damages and $525,000 in punitive damages. The district court entered final judgment in accordance with the jury verdict, and later denied the officers' post-trial motions seeking judgment as a matter of law or a new trial.

Upon our review, we affirm the district court's judgment. Hicks presented a cognizable *Bivens* claim because his claim is not meaningfully different from the claim asserted in *Bivens*. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017). Both cases involved allegations of unjustified, warrantless seizures in violation of the Fourth Amendment committed by federal "line" officers conducting routine police work. Also, the officers were not entitled to qualified immunity. They violated Hicks's Fourth Amendment rights by significantly prolonging the initial stop without justification, and by Officer Phillips's action initiating a second, unjustified stop. This constitutional right to be free from such unlawful seizures was clearly established at the time the seizures occurred.

We further conclude that the officers did not suffer prejudice when Hicks addressed indemnification by the government during rebuttal closing argument because the officers

2

earlier had asserted during their closing argument that they would suffer personal financial loss if a verdict were rendered against them. And finally, Hicks presented sufficient evidence of emotional injury to support the compensatory damage award, and the punitive damages award was not excessive.

I.

We state the facts in the light most favorable to Hicks, the prevailing party at trial. *See Weiner v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 784 (4th Cir. 2023). On July 11, 2015, around 6 a.m., Nathaniel Hicks, a special agent with the United States Secret Service (Secret Service)[1] was parked in his unmarked car on the shoulder of the Baltimore-Washington Parkway in Maryland. At that time, Hicks was waiting to join a motorcade to protect the Secretary of the Department of Homeland Security.

Defendant Gerald Ferreyra, an officer with the United States Park Police (USPP), who is White, saw Hicks's car and stopped to perform a "welfare check" to ensure that the driver did not need assistance (the first stop). Officer Ferreyra, who was in his USPP uniform, approached the vehicle's passenger side and observed that Hicks, who is Black, appeared to be asleep. After seeing a handgun in a "holstered case" laying on the front passenger seat, Officer Ferreyra pointed his service weapon at Hicks, screamed at Hicks, and ordered him not to reach for his weapon. Hicks complied, raising his hands in the air and explaining that he was a Secret Service agent. At Officer Ferreyra's request, Hicks displayed his Secret Service credentials, which included a photograph of him. As Officer

---

[1] Hicks retired from his position with the Secret Service in December 2016.

3

Ferreyra took possession of Hicks's credentials, Ferreyra continued to appear "very agitated to the point of . . . spitting at the mouth while he was shaking profusely with the handgun pointed in [Hicks's] direction." At this point, Officer Ferreyra removed Hicks's weapon from the car and returned to his patrol vehicle.

When Hicks explained to Officer Ferreyra that he had parked his car while waiting to join a protective motorcade, Ferreyra responded that this was "one motorcade that [Hicks] was not going to be participating in." Officer Ferreyra repeatedly cursed at Hicks, telling him to shut the "f" up and that Ferreyra was not an "f'[in]g rookie."

Despite Officer Ferreyra's initial concern regarding the handgun, Ferreyra was aware after examining Hicks's credentials that Hicks was authorized to carry the gun. However, instead of releasing Hicks, Officer Ferreyra called for additional USPP officers to report to the scene.

Defendant Brian Phillips, another USPP officer who is White, arrived shortly thereafter. Officer Phillips understood from Officer Ferreyra that Hicks was not a suspect in a criminal matter. Officer Phillips "interrogate[d]" Hicks about why he was in the "Park Police district" and directed Hicks to "sit still and don't move." Hicks described Officer Phillips as acting "very belligerent and upset."

After Officer Ferreyra returned to Hicks's vehicle, Ferreyra told Hicks that he was not allowed to "go[] anywhere" until the USPP supervisor arrived. Officer Ferreyra stated at trial that he was following a USPP practice requiring officers to call a supervisor to "the scene" before releasing an individual who had displayed a weapon. However, when the

jury considered this testimony in answering special interrogatories, the jury found that Officer Ferreyra was not "follow[ing] a customary [USPP] practice."

The motorcade to which Hicks had been assigned passed the scene around 6:40 a.m. At some point after the motorcade had passed, a USPP supervisor, Sergeant Wallace, approached Hicks's car while Hicks was talking on his cell phone with his Secret Service supervisor. At Hicks's supervisor's suggestion, the two supervisors spoke to each other on Hicks's cell phone. After this conversation, Sergeant Wallace informed Hicks that he was free to leave, and Officer Ferreyra returned Hicks's weapon and credentials. In total, the officers had detained Hicks for about an hour after confirming that he was a Secret Service Agent authorized to carry a weapon.

Within minutes after Hicks drove away, Officer Phillips initiated a second traffic stop involving Hicks (the second stop). Officer Phillips stated that he stopped Hicks because he saw the car "swerve[] over into the right shoulder," and because he saw the car's driver talking on his cell phone. The jury did not credit Officer Phillips's testimony, finding in a special interrogatory that Phillips did not observe Hicks driving erratically or talking on his mobile phone. The jury further found in answering an additional special interrogatory that Officer Phillips knew that it was Hicks's vehicle before initiating the traffic stop.

After approaching Hicks's car, Officer Phillips immediately told Hicks that he was being "mouthy." Officer Phillips demanded Hicks's license and registration and detained him for a few minutes before ultimately releasing him without issuing a ticket.

Hicks filed the present action in the district court against Officers Ferreyra and Phillips under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that the USPP officers violated his Fourth Amendment rights when (1) they unlawfully prolonged the first stop, and (2) Officer Phillips unlawfully seized Hicks a second time. The district court denied the officers' motion for summary judgment asserting qualified immunity. The officers later filed an interlocutory appeal, challenging the immunity ruling and also arguing for the first time on appeal that Hicks's claim under *Bivens* was barred by the Supreme Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017) (clarifying the framework used to determine when a *Bivens* implied cause of action is available).

We dismissed for lack of jurisdiction the officers' challenge to the district court's ruling on qualified immunity because the officers' arguments focused on factual, not legal, disputes. *Hicks v. Ferreyra*, 965 F.3d 302, 313 (4th Cir. 2020). We also held that the officers had forfeited their *Bivens* argument in the interlocutory appeal by not raising it in the district court. *Id.* at 309, 312.

On remand during the jury trial, the officers moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), arguing that a *Bivens* remedy was not permitted under the Supreme Court's holding in *Abbasi* and that the officers were entitled to qualified immunity. The district court denied the motion before submitting the case to the jury.

The jury found in Hicks's favor, concluding that both officers acted under color of law and violated Hicks's Fourth Amendment rights during the first stop. The jury also

found that Officer Phillips violated Hicks's Fourth Amendment rights in conducting the second stop.

Based primarily on Hicks's testimony about his resulting emotional distress, which we describe in detail below, the jury awarded Hicks $80,000 in compensatory damages against Officer Ferreyra, and $125,000 in compensatory damages against Officer Phillips. The jury also awarded Hicks $225,000 in punitive damages against Officer Ferreyra, and $300,000 in punitive damages against Officer Phillips, finding that the officers acted with malice or reckless indifference to Hicks's rights.

The officers filed post-trial motions for judgment as a matter of law and for a new trial or remittitur under Rules 50(b) and 59(a). In addition to renewing their arguments raised in their Rule 50(a) motion addressing *Bivens* and qualified immunity, the officers also argued that they were entitled to a new trial on three grounds discussed in more detail below: (1) the jury improperly was influenced by impermissible discussion of indemnification during Hicks's rebuttal closing argument; (2) the compensatory damages award was not supported by the evidence; and (3) the punitive damages award was excessive. The district court denied the officers' motions and entered final judgment in accordance with the jury verdict.

The officers now appeal, challenging each ground on which the district court denied their post-trial motions. We discuss each argument in turn.

II.

The officers challenge on two grounds the district court's denial of their renewed motion for judgment as a matter of law under Rule 50(b): (1) the court's conclusion that Hicks presented a viable claim under *Bivens*; and (2) the court's denial of the officers' claim of qualified immunity. We review de novo the district court's rulings. *EEOC v. Consol. Energy, Inc.*, 860 F.3d 131, 142 (4th Cir. 2017). In conducting this review, we view "the evidence in the light most favorable to the prevailing party." *FDIC v. Bakkebo*, 506 F.3d 286, 294 (4th Cir. 2007).

A. *Bivens*

We first address the officers' argument that the district court erred by concluding that Hicks presented a cognizable claim under *Bivens*. In *Bivens*, the Supreme Court recognized an implied right of action in which "victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court." *Carlson v. Green*, 446 U.S. 14, 18 (1980) (discussing *Bivens*, 403 U.S. 388). At issue in *Bivens* was whether a plaintiff was entitled to seek damages in a civil action after federal narcotics officers conducted a warrantless search of his apartment, arrested him for alleged narcotics violations, and later subjected him to a visual strip search. *Bivens*, 403 U.S. at 389. The plaintiff alleged that the officers violated the Fourth Amendment by conducting the warrantless search of his home and seizure of his person without probable cause and by using excessive force. *Id.*

After *Bivens*, the Supreme Court has recognized in two other cases an implied right of action against a federal agent committing a constitutional violation, *Davis v. Passman*,

8

442 U.S. 228 (1979) (involving an alleged violation of equal protection under the Fifth Amendment Due Process clause), and *Carlson v. Green*, 446 U.S. 14 (1980) (involving an alleged violation of the Eighth Amendment's Cruel and Unusual Punishments clause). However, as the Court recognized in *Abbasi*, since issuing these decisions, the Court has "refused to extend *Bivens*" to permit a cause of action in any case involving "any new context or new category of defendants."  137 S. Ct. at 1857 (explaining that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity" (citation omitted)).  In drawing this line, the Court has emphasized that when a different context arises or different categories of defendants are involved, Congress "most often" should decide whether to provide a damages remedy.  *Id.*; *see also Hernández v. Mesa*, 140 S. Ct. 735, 741 (2020); *Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022).

In *Abbasi*, the plaintiffs alleging a cause of action under *Bivens* were non-citizens who were in the United States without authorization and who had been arrested and detained for several months because they were "of interest" in investigations into the terrorist attacks that occurred on September 11, 2001.  137 S. Ct. at 1852-53.  The plaintiffs filed suit against several high-level Executive Branch officers responsible for establishing "detention polic[ies]" related to the September 11 investigation, as well as against the facility wardens for their various roles in imposing restrictive and abusive conditions of confinement.  *Id.* at 1853-54, 1858.  Seeking a *Bivens* remedy, the plaintiffs alleged both Fourth and Fifth Amendment violations.  *Id.* at 1853-54.  In declining to allow a *Bivens* remedy for the plaintiffs' detention policy claims, the Court explained that these claims challenged "the confinement conditions" imposed on non-citizens "pursuant to a high-level

9

executive policy created in the wake of a major terrorist attack" and, thus, qualified as a "new *Bivens* context." *Id.* at 1860; *see also id.* at 1865 (holding that "the new-context inquiry is easily satisfied" for the plaintiffs' Fifth Amendment claim against the warden). The Court further stated that separation-of-powers concerns drove its decision to "retain" the scope of *Bivens* to the "common and recurrent sphere of law enforcement." *Id.* at 1856-57.

To assist courts in evaluating actions asserted under *Bivens*, the Court articulated a two-step inquiry in *Abbasi* for determining whether a *Bivens* remedy is available in a given case. *Id.* at 1857-60; *see Egbert*, 142 S. Ct. at 1803. First, a court must assess whether the case presents "a new *Bivens* context." *Abbasi*, 137 S. Ct. at 1859; *Tun-Cos v. Perrotte*, 922 F.3d 514, 522 (4th Cir. 2019). Although a "radical difference is not required" to conclude that a case presents "a new *Bivens* context," *Tun-Cos*, 922 F.3d at 523, the differences between the case at issue and *Bivens* must be "meaningful," *Abbasi*, 137 S. Ct. at 1859-60.

In discussing whether a case presents a "new context" that is "meaningfully different" from the existing scope of *Bivens* remedies, the Court in *Abbasi* provided a "non-exhaustive list of potentially meaningful differences." *Annappareddy v. Pascale*, 996 F.3d 120, 133 (4th Cir. 2021). The Court stated that a "meaningful difference" may be found based on:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1860.

"If the context is *not* new . . . then a *Bivens* remedy continues to be available." *Tun-Cos*, 922 F.3d at 522-23. "But if the context *is* new, courts must move to the second step of the *Bivens* analysis" to evaluate whether "special factors" suggest that Congress is better equipped to determine whether a damages action should be permissible. *Annappareddy*, 996 F.3d at 133. Recently, the Court explained that these two steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 142 S. Ct. at 1803. With these considerations in mind, we turn to consider the officers' arguments.

The officers contend that Hicks's claim presented a new *Bivens* context, despite the fact that both Hicks and the plaintiff in Bivens similarly alleged a Fourth Amendment violation involving a warrantless seizure. The officers emphasize that unlike in *Bivens,* Hicks's home was not searched, and the officers did not arrest Hicks or use excessive force against him. The officers further observe that *Bivens* did not involve an officer's allegedly unlawful and prolonged seizure of a citizen during a traffic stop. Finally, the officers maintain that the present case involved "a bizarre, inter-agency squabble within the [E]xecutive [B]ranch," constituting a special factor and a reason that Congress might be better equipped to create a damages remedy in such a situation. We disagree with the officers' arguments.

We conclude that the present case can be resolved at the first step of the *Abbasi* inquiry. After considering whether the present case presents "a new *Bivens* context" within the meaning of *Abbasi*, 137 S. Ct. at 1859, we answer "no." In reaching this conclusion,

we rely on the Supreme Court's clear explanation in *Abbasi* that its severe narrowing of the *Biven*s remedy in other contexts does not undermine the vitality of *Bivens* in the warrantless-search-and-seizure context of routine criminal law enforcement. 137 S. Ct. at 1856.

The Court took great care in making this point in *Abbasi*, emphasizing that its holding restricting the availability of a *Bivens* remedy was "not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." *Id.* Placing even further emphasis on this distinction, the Court stated that "[t]he settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere." *Id.* at 1857. Thus, while the decision in *Abbasi* effectively may have halted the expansion of a *Bivens* remedy to cases outside the context of the three, existing decisions recognizing such a remedy, *Abbasi* reaffirmed that a *Bivens* remedy remains available to address violations of the Fourth Amendment involving unjustified, warrantless searches and seizures by line officers performing routine criminal law enforcement duties.

To highlight this point, we observe that the present case is materially different from the Fourth Amendment context we considered in *Annappareddy*, 996 F.3d 120. There, we observed in our analysis that courts do not evaluate a potential *Bivens* cause of action "at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'" *Id.* at 135 (quoting *Cantú v. Moody*, 933 F.3d 414, 422 (5th Cir. 2019)). After observing that *Bivens* involved a claim grounded on the right to be free from *warrantless* searches and seizures, we distinguished that context from the context of

12

searches authorized by a warrant, which "implicate[] a distinct Fourth Amendment guarantee—that 'no Warrants shall issue, but upon probable cause.'" *Id.* at 136-37 (quoting U.S. Const. amend IV). We explained that the decision to issue a warrant involves different aspects of police work, including "information-gathering and case-building activities," which are different from the warrantless apprehension, detention, and other issues presented in *Bivens*. *Id.* at 136 (citation omitted). Thus, we held in *Annappareddy* that the search of a corporate office with a warrant presented a new *Bivens* context, one that "would pose a greater risk of intruding on the investigatory and prosecutorial functions of the executive branch." *Id*. at 136-37.

In contrast to the factual and procedural context of *Annappareddy*, the case before us does not involve a search with a warrant, the exercise of prosecutorial judgment, or possible intrusion into "the investigatory and prosecutorial functions of the executive branch." *Id.* As we previously observed and we now hold, the present case involves "not an extension of *Bivens* so much as a replay" of the same principles of constitutional criminal law prohibiting the unjustified, warrantless seizure of a person. *Hicks*, 965 F.3d at 311.

As in *Bivens*, Hicks filed suit "to hold accountable only line-level investigative officers, not high-ranking officials." *Annappareddy*, 996 F.3d at 135. The claims against the officers in both the present case and in *Bivens* were based on the officers' discrete actions and did not implicate "large-scale policy decisions" or other general directives or statutes. *Abbasi*, 137 S. Ct. at 1862. Instead, the officers' actions here and in *Bivens* were taken in purported execution of principles of criminal law well-informed by decades of

judicial guidance regarding the Fourth Amendment prohibition on the warrantless seizure of citizens without reasonable, articulable suspicion or probable cause.[2]  *See id.*

Even though the seizure in *Bivens* culminated in a custodial arrest, in contrast to the unlawful detentions that occurred in the present case, the seizures in both cases were subject to the same objective inquiry of reasonableness mandated by Fourth Amendment jurisprudence.  *Compare Bivens*, 403 U.S. at 389 (describing allegations as including an "arrest . . . made without probable cause"), *and United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (explaining that probable cause "is an objective standard"), *with United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2013) ("A traffic stop is reasonable . . . if it is justified by probable cause or reasonable suspicion."), *United States v. Williams*, 808 F.3d 238, 245-46 (4th Cir. 2015) (observing that an officer must have "reasonable suspicion" to extend an otherwise completed traffic stop), *and United States v. Miller*, 54 F.4th 219, 228 (4th Cir. 2022) (recognizing that reasonable suspicion requires an "objective justification" for believing that criminal activity is afoot).  While a temporary detention can be justified by a lesser showing than probable cause, namely, by establishing reasonable, articulable suspicion of criminal activity, *see Navarette v. California*, 572 U.S. 393, 396 (2014), this threshold showing does not alter the constitutional right at issue or its

---

[2] The fact that *Bivens* involved two additional types of Fourth Amendment claims, namely, the warrantless search of a home and the excessive use of force, does not constitute a meaningful difference for our purposes.  Nothing in *Abbasi* or later cases suggests that a plaintiff asserting a cause of action under *Bivens* must match, in number and in kind, *all* the claims raised in that case.  Accordingly, we reject the officers' suggestion that because the present case did not involve a search of Hicks's home and the officers did not use excessive force in unlawfully detaining Hicks, the present case necessarily constitutes a new *Bivens* context.

14

application to the routine enforcement of criminal laws.  And, although the Supreme Court has articulated a clear purpose of not expanding the reach of *Bivens*, the Court has not signaled an intent to prohibit its application in cases involving less egregious intrusions of an individual's right to be free from unjustified, warrantless seizures.

As we previously have observed, courts, including this Court, have applied "*Bivens* to Fourth Amendment claims arising from police traffic stops like this one."  *Hicks*, 965 F.3d at 311-23 (collecting cases).  The officers in the present case confronted nothing more than established principles of Fourth Amendment law with extensive judicial guidance regarding the right of individuals to be free from unjustified, warrantless seizures.  *See Abbasi*, 137 S. Ct. at 1860; *see infra* pp. 19-21.

We reject the officers' assertion that authorizing a *Bivens* cause of action in the present case risks intrusion into the functioning of the Executive Branch.  The officers employed by the USPP were engaged in routine law enforcement measures.  Hicks was subjected to unlawful detentions that had nothing to do with an "inter-agency squabble within the [E]xecutive [B]ranch."  In fact, as the jury specifically found in its answers to the special interrogatories, the officers were not following a USPP policy when they called for a supervisor to respond to the scene.  In short, nothing about Hicks's claim provides a reason to conclude that "Congress might be better equipped" to determine whether to allow this civil action.[3]  *Egbert*, 142 S. Ct. at 1803.

---

[3] We reject the officers' assertion that we should recognize as a special factor that Hicks had available to him "alternative remedies."  The officers fail to identify any alternative remedy available to Hicks for the constitutional violations and instead cite only (Continued)

15

For these reasons, we hold that the unlawful seizures at issue in the present case do not present a new *Bivens* context and, thus, that Hicks's claims are cognizable under *Bivens*. *See Tun-Cos*, 922 F.3d at 522-23. Accordingly, we conclude that the district court did not err in denying the officers' Rule 50(b) motion on this ground.

## B. Qualified Immunity

We turn to consider the officers' assertion that the district court erred by denying their claim of qualified immunity. The doctrine of qualified immunity "balances two important interests," namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform duties responsibly from "harassment, distraction, and liability." *Wilson v. Prince George's County*, 893 F.3d 212, 219 (4th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The burden of establishing the affirmative defense of qualified immunity rests on the party seeking to invoke it. *Id.*

In considering whether the officers met their evidentiary burden, we ordinarily employ a two-step inquiry. We first consider whether the facts, as found by the jury,

---

that a meeting "evidently took place" between a Secret Service supervisor and the inspection division of the Secret Service. Additionally, we reject as meritless the officers' contention that permitting a *Bivens* claim here will result in an "onslaught of *Bivens* claims" based on federal officers' welfare checks and traffic stops "gone awry." There is nothing in the record to support this speculation.

And finally, the officers argue that Hicks's claim potentially implicated national security by asserting, for the first time on appeal, that Hicks was stopped "near the headquarters of the National Security Agency." *See Egbert*, 142 S. Ct. at 1806 n.3 (explaining that courts have "'a concomitant responsibility' to *evaluate any grounds that counsel against* Bivens *relief*" (emphasis added) (citation omitted)). We conclude that the officers' post-hoc contention is meritless, because it rests purely on coincidental proximity with no relevance to the facts or constitutional violations at issue.

16

established that the officers' conduct violated Hicks's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 232.  If the record shows that an officer violated one or more of these constitutional rights, we will evaluate under the second prong whether any such rights were "clearly established" at the time of the officers' conduct. *Id*.

The Fourth Amendment protects individuals from unreasonable seizures.  U.S. Const. amend. IV.  A limited detention, including an investigatory stop or a traffic stop for a suspected violation of law, is a "seizure" subject to Fourth Amendment protections and requires, at a minimum, "reasonable suspicion" of criminal activity.  *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (citing *Brendlin v. California*, 551 U.S. 249, 255-59 (2007)); *Navarette*, 572 U.S. at 397.  "[R]easonable suspicion exists when law enforcement officers [have] a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004) (quotation marks and citation omitted).  The Supreme Court has made clear that even if a limited detention is justified at its inception, a stop becomes unlawful if prolonged beyond the time necessary to effectuate the stop's purpose.  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015); *see also United States v. Sharpe*, 470 U.S. 675, 686 (1985) (explaining that in assessing whether a detention is too long to be justified as an investigative stop, courts consider whether the time was necessary to conduct a diligent investigation to confirm or dispel suspicions).

The officers do not dispute that the Fourth Amendment protects individuals from unreasonable seizures of their person.  Instead, the officers assert that the prolonged

detention during the first stop to bring a supervisor to the scene was justified, and that no precedent placed them on notice that their conduct was unreasonable. The officers also maintain that given the "unusual circumstances" involving an encounter between USPP officers and a Secret Service agent, it would not have been clear to a reasonable officer that it was unlawful to detain Hicks during the first stop for nearly an hour until a USPP supervisor arrived. With regard to the second stop by Officer Phillips, the officers merely rely on facts rejected by the jury in their answers to the special interrogatories. We disagree with the officers' arguments.

The jury's findings in the special interrogatories, which the officers do not challenge, make plain the officers' violation of Hicks's Fourth Amendment rights. The first stop began when Officer Ferreyra conducted a "welfare check" on the well-being of the driver, Hicks, in a car parked on the side of a highway. Even if we assume that Officer Ferreyra's observation of the gun on the front passenger seat gave rise to an objectively reasonable suspicion of criminal activity, that justification ceased when Ferreyra confirmed that Hicks, as a Secret Service agent, was authorized to carry a firearm. *See Sharpe*, 470 U.S. at 686. Moreover, as the jury found, the USPP did not have a customary practice that a supervisor come to the scene before an officer could release an individual who had displayed a weapon. Thus, the prolonged first detention of nearly an hour after any justification ceased plainly violated Hicks's Fourth Amendment right to be free from

18

unreasonable seizures. *Rodriguez*, 575 U.S. at 354; *Caballo*, 543 U.S. at 407; *see United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017).

The jury's special interrogatory responses likewise demonstrate that Officer Phillips violated Hicks's Fourth Amendment rights by initiating the second stop.[4]  The jury found that Officer Phillips knew that Hicks was driving the car before initiating the stop, and rejected Phillips's only proffered justifications for the stop, namely, that he had "observed a motorist driving erratically and talking on his mobile phone."  Without a lawful basis to initiate the second stop, Officer Phillips violated Hicks's right to be free from an unjustified detention.  *See Singh*, 363 F.3d at 355.  Because the evidence and jury findings showed that the officers' conduct during the first and second stops violated Hicks's Fourth Amendment right to be free from unlawful seizures, we turn to consider whether that right was clearly established when the seizures occurred.

The inquiry into whether a constitutional right is "clearly established" requires defining the right at issue.  *Halcomb v. Ravenell*, 992 F.3d 316, 319-20 (4th Cir. 2021).  The Supreme Court has cautioned against defining a right with "a high level of generality," particularly in the context of a Fourth Amendment claim.  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted).  "However, a 'general constitutional rule may apply with obvious clarity even though the very action in question has not previously'" been

---

[4]  With respect to the second stop, the officers argue, for the first time on appeal, that even if Officer Phillips initiated the stop based on a mistaken belief that Hicks was driving erratically, "seizures based on mistakes of fact can be reasonable." *Heien*, 574 U.S. at 61.  We decline to consider this argument because it was not preserved below. *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993).

addressed. *Halcomb*, 992 F.3d at 320 (quoting *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017)); *Wilson*, 893 F.3d at 222 (explaining that we look to general principles to hold that a right is clearly established in "obvious case[s]" of Fourth Amendment violations).

The "key inquiry" is not whether a court has "considered *identical* factual circumstances and held that an officer's conduct violated particular constitutional rights," but whether officers within our jurisdiction have been provided fair warning, with sufficient specificity, that their actions would qualify as a deprivation of an individual's rights. *Betton v. Belue*, 942 F.3d 184, 193-94 (4th Cir. 2019) (citing *Wilson*, 893 F.3d at 221). With these principles in mind, the question before us is whether it was clearly established in July 2015 that, after a lawfully initiated traffic stop, an officer could continue to detain an individual, and detain that individual a second time, after the officer's suspicion of a possible crime had been resolved in the detainee's favor and the officer lacked any new basis to justify the detention.

In light of the above-stated precedent establishing the Fourth Amendment violations, we have little trouble concluding that settled law provided fair warning to the officers that their actions would constitute a deprivation of Hicks's rights during both the first and second stops. And, contrary to the officers' contention, Hicks's employment with the Secret Service did not alter this established law or bear in any way on Hicks's right to be free from an unlawful seizure of his person. Additionally, as found by the jury in answering the special interrogatories, the officers were not following "a customary practice" of the USPP by requesting a supervisor's presence before releasing Hicks during the first stop. Accordingly, the officers' emphasis on the "unusual circumstance[]" of the

20

encounter with a Secret Service agent was irrelevant to the "obvious clarity" of the right at issue here. *Halcomb*, 992 F.3d at 320. Indeed, the officers testified that they had received training and understood that they could not detain an individual without justification in violation of the Fourth Amendment. We therefore affirm the district court's conclusion that the officers were not entitled to qualified immunity.

III.

We next address the officers' argument that the district court erred in denying their motion for a new trial because: (1) the officers allegedly suffered prejudice from the indemnification information presented to the jury during Hicks's rebuttal closing argument; (2) the evidence was insufficient to support the award of compensatory damages; and (3) the amount of punitive damages was excessive. When a district court denies a motion for a new trial, we employ a deferential abuse-of-discretion standard, reversing the court's judgment only in "exceptional circumstances." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014) (citation omitted).

A court "abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018) (citation omitted). "A district court may grant a new trial only if

the verdict: (1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice." *Consol. Energy, Inc.*, 860 F.3d at 145.

## A. Indemnification

The officers contend that the jury was "improperly influenced by inadmissible indemnification evidence" presented during Hicks's rebuttal closing argument. Before addressing the officers' argument on this issue, we describe the relevant portions of each party's closing arguments and the district court's ruling on this issue.

During the officers' closing argument, their counsel described the financial burden that each officer allegedly would suffer if the jury returned a verdict for Hicks. Defense counsel stated that "Hicks ultimately is seeking to put a vacuum cleaner up to [the officers'] bank account[s]." Defense counsel also stated that Hicks's claim was not "against the United States" or the USPP, but was against the two officers "personally," placing their personal bank accounts "at risk," and affecting "two people's families."

After these comments by the officers' counsel, Hicks's counsel argued to the court that defense counsel "opened the door" regarding whether the officers personally would be liable for a damages award and requested permission to "say something to the jury about indemnification and that a judgment would not come out of [the officers'] pockets." Hicks's counsel also noted to the district court an interrogatory answer in which the officers had acknowledged that the government could indemnify them against a damage award. In response, defense counsel clarified that the officers would not be "automatically indemnified," and would need to request indemnification from the federal government. The district court responded that "neither is it absolutely the truth that" the officers would

22

have "to pay [a judgment] out of their own pocket[s]."  The court therefore stated that it would permit Hicks's counsel to read the interrogatory and answer to the jury.

During rebuttal closing argument, Hicks's counsel stated that "there was a question about who would cover the judgment in this case.  Defendants are not personally covering the judgments in this case.  Their families or whatever defense counsel said are not at risk.  This is not a vacuum cleaner to their personal bank accounts.  That statement was wrong."  After the officers objected to these statements, the court directed Hicks's counsel to read the interrogatory question and answer.  Hicks's counsel complied:

> The question is, "If any person or entity may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy any judgment in this action, describe the terms of any such agreement or arrangement."

> And the sworn response was, "The U.S. Government will cover any liability held against Officer Ferreyra and Officer Phillips as long as he was acting within the scope of his employment during the pertinent times."

Defense counsel did not make any further objections.

During deliberations, the jury submitted a question to the court asking whether the officers would be "paying directly" any damages award or whether "the government [would] be paying?"  The parties agreed with the district court's proposed response, in which the court instructed that (1) the jury had been informed that the officers stipulated that they were "acting under color of law" during the two stops, and (2) the jury had been read an interrogatory answer on the issue of indemnification.

In the officers' motion for a new trial, they argued, as they do on appeal, that the district court erred in permitting Hicks's counsel to read the interrogatory answer regarding

indemnification and instead should have provided a curative instruction. The officers also argued that the interrogatory answer read to the jury was incomplete because it omitted the first portion of the answer: "While Ofc. Ferreyra has no personal knowledge responsive to this [interrogatory], the undersigned [counsel] understands that" the federal government "will cover any liability."

In rejecting these arguments, the district court observed that defense counsel raised the question in the first instance of who would pay a judgment by making "multiple highly-charged emotional remarks" suggesting that the officers would bear financial liability for any judgment, without any supporting evidence for these "untrue" statements. The court held that defense counsel's statements improperly "appeal[ed] to the jury for sympathy." Thus, the district court concluded that even though evidence of indemnification generally is not admissible, defense counsel's remarks gave the jury "a wrong impression" that required "cur[ing]." *See Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998) (observing that indemnification evidence is not typically permitted but holding that such evidence should have been permitted after the opposing party submitted evidence that the party could not afford to pay damages).

The district court also observed that the officers did not ask for a curative instruction or object to the interrogatory answer when it was read. The court further noted that the substance of the interrogatory answer was not altered by the omitted statement that Officer Ferreyra lacked personal knowledge of indemnification by the government. Thus, the

district court concluded that the officers did not suffer prejudice or a miscarriage of justice and denied their request for a new trial under Rule 59(a).

We hold that the district court did not abuse its discretion in this regard. In addition to the sound analysis offered by the district court, we observe that the officers "concede[d]" on appeal that their statements regarding the officers' personal bank accounts "may have been objectionable and warranted a curative instruction." But the officers did not proffer a curative instruction or object to the interrogatory answer on the grounds that Hicks's counsel had omitted part of the answer. Nor did the officers object to the court's answer to the jury's question about payment of a damages award, or to the court's action informing the jury that the officers had stipulated that they were acting "under color of law." *See Dennis v. Gen. Elec. Corp.*, 762 F.2d 365, 367 (4th Cir. 1985) (explaining that a motion for a new trial should not be granted when the movant fails to object to the "alleged impropriety"). In view of this record, we cannot say that the district court acted "arbitrarily or irrationally" in permitting Hicks's counsel to read a portion of the interrogatory answer in response to defense counsel's objectionable statements regarding the officers' personal financial burden. *See Dillard*, 891 F.3d at 158.

## B. Damages

Finally, the officers challenge the district court's denial of their motion under Rule 59(a) for a new trial or for remittitur on the grounds that (1) the compensatory damages award was not supported by the evidence, and (2) the punitive damages award was

excessive. Before addressing these arguments, we describe the evidence presented regarding Hicks's injuries, which primarily rested on his own testimony.

Hicks stated that he feared for his life at the beginning of the first encounter with Officer Ferreyra and continued to feel "terrified" even after Ferreyra walked away from Hicks's car. Hicks also testified that he felt belittled by the prolonged detention and by the officers cursing at him. Hicks related that he felt alone and helpless, being a solitary Black male confronted by White officers and not knowing what might happen during the encounter. In addition, according to Hicks, this was the first time during his 20-year career that he was unable to complete a work assignment.

Hicks further testified that he continued to be emotionally upset as a result of the events that day. According to Hicks, this emotional toll caused him to have trouble sleeping, and to suffer impaired relationships with his family members and colleagues.

Hicks also described how the incidents made him fear for his family's safety by explaining that the encounters with the officers could have escalated if he had not remained calm. He stated that he was frightened to think about what might have happened if his son or daughter had been stopped by the officers. Hicks further stated that he sought psychological counseling for the first time in his life due to his distress but that, because of his job travel requirements, he had attended only two sessions.

Hicks also presented testimony from one witness who corroborated Hicks's emotional distress, Miltom Wilson, then-Deputy Assistant Director of the Secret Service, Office of Protective Operations. Wilson observed Hicks about six weeks after the stops and described his altered appearance and demeanor, stating that Hicks had lost weight and

26

was distressed and subdued, with a "look of anguish on his face." When Wilson asked Hicks what was wrong, Hicks described the encounters with the officers. Wilson later observed a further decline in Hicks's demeanor and emotional state, and stated that the incident with the officers "was weighing on [Hicks] more and more as time went on."

After the close of the evidence, the jury was instructed that if it found that either officer violated Hicks's constitutional rights, it should "determine an amount of money that is fair compensation" for Hicks's damages proved by a preponderance of the evidence and caused by the officers' "allegedly wrongful conduct." The jury further was told that it could award compensatory damages for pain, suffering, or mental anguish that Hicks experienced as a result of the officers' actions. And the jury was instructed that if Hicks suffered a deprivation of his constitutional rights but did not sustain any resulting injury, the jury may "award nominal damages." Regarding the availability of punitive damages, the jury was instructed to consider the degree to which the officers "should be punished" for any wrongful conduct and whether an award would deter the officers or others from committing future wrongful acts.

The jury awarded Hicks $80,000 in compensatory damages and $225,000 in punitive damages against Officer Ferreyra, and $125,000 in compensatory damages and $300,000 in punitive damages against Officer Phillips, for a total award of $205,000 in compensatory damages and $525,000 in punitive damages. We first turn to address the

officers' arguments regarding the compensatory damages award and later address the punitive damages award.

1.

The officers argue that the district court abused its discretion in denying their motion for a new trial under Rule 59(a) because the compensatory damages award was not supported by the evidence. *See FDIC*, 506 F.3d at 294. A district court's denial of a request for a new trial "rests with the sound discretion of the trial judge and will not be reversed absent an abuse of discretion." *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 436 (4th Cir. 2004). "[J]ury determinations of factual matters such as . . . the amount of compensatory damages will be reviewed by determining whether the jury's verdict is against the weight of the evidence or based on evidence which is false." *Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). When considering a motion for a new trial under Rule 59, "a trial judge may weigh the evidence and consider the credibility of the witnesses." *Poynter ex rel. Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989).

The officers contend that the evidence of Hicks's emotional distress did not justify the compensatory damage award because Hicks's distress did not interfere with his job performance, require medical attention, cause physical injuries, or result in economic loss. According to the officers, Hicks's emotional distress was caused by having a gun pointed

at him by the officers, not from the officers' unconstitutional conduct in unlawfully seizing him. We disagree with the officers' arguments.

Compensatory damages are available to plaintiffs asserting a *Bivens* claim who suffer humiliation, embarrassment, and other emotional harm without accompanying physical or economic injuries. *Bivens*, 403 U.S. at 389-90 (explaining that plaintiff sought $15,000 from each defendant officer based on humiliation, embarrassment, and mental suffering); *see Passman*, 442 U.S. at 234, 245. Damages generally "may not be presumed from every constitutional violation, but must be proven by competent, sufficient evidence." *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996). Indeed, as the jury was instructed in the present case, nominal damages should be awarded if the plaintiff was deprived of a constitutional right, without any resulting injury such as physical, emotional, or financial damage. *See id.* at 1246.

A plaintiff's testimony alone may be sufficient to support an award of compensatory damages based on emotional distress resulting from a constitutional violation. *Id.* at 1254. But that testimony must show "demonstrable" distress that is "sufficiently articulated" and not "conclusory." *Id.* at 1254-56 (reversing award based on emotional injuries of several plaintiffs who did not show need for medicine, physical symptoms, psychological disturbance, counseling, description of distress, "how their conduct changed or if others observed their changed conduct," or any corroboration of distress). In other words, a

plaintiff must present evidence that a "genuine injury" occurred.  *Id.* at 1254 (citation omitted).

Courts may consider the following factors in evaluating the sufficiency of evidence of emotional distress: the degree of distress; the context of events surrounding the distress; corroborative evidence; a nexus between the violation and the distress; any mitigating circumstances; medical attention; psychiatric or psychological treatment; physical injuries; and any loss of income. *Knussman v. Maryland*, 272 F.3d 625, 640 (4th Cir. 2001). Applying these factors, the district court held that the compensatory damages award was supported by sufficient evidence and was not "against the weight of the evidence." We find no abuse of discretion in this determination.

Hicks's testimony regarding his emotional distress, although subjective in nature, was descriptive in its severity.  He recounted that he sought counseling and experienced ongoing sleep deprivation, and he described the negative impact of the unlawful seizures on his relationships with his family and his coworkers.  He also presented a corroborating witness who described Hicks's physical and mental decline after the encounters with the officers. *See Jones v. SouthPeak Interactive Corp. of Del.*, 777 F.3d 658, 673 (4th Cir. 2015) (evidence about emotional difficulty was specific and corroborated). *But see Hetzel v. County of Prince William*, 89 F.3d 169, 171 (4th Cir. 1996) (holding evidence of emotional injury too "thin" when plaintiff did not seek professional help and complained of headaches and "problems with her family life" with no corroborating evidence).  And notably, the district court found both Hicks's and Wilson's testimony credible.  On this record, we conclude that Hicks presented evidence of a "genuine injury" that was

30

"sufficiently articulated" to support the award of compensatory damages. *See Price*, 93 F.3d at 1254-55.

Our conclusion is not altered by the officers' argument that Hicks's distress resulted from having a gun pointed at him, rather than from the unconstitutional seizures. The jury heard Hicks describe that he feared for his life when he saw Officer Ferreyra's gun pointed at him, and when Ferreyra continued to do so after Hicks provided his Secret Service credentials. The jury also heard Hicks explain that he continued to feel "terrified" even after Officer Ferreyra walked away from Hicks's car. The jury also was permitted to consider Hicks's explanation that he continued to feel "helpless" and belittled as a Black man confronted by armed White officers who were taunting him during the unlawfully prolonged detention. The jury further could infer on this record that the mental anguish Hicks suffered as a result of the first unlawful detention was compounded by Officer Phillips's second, unjustified stop, which the jury could have determined was initiated to continue the officers' harassment of Hicks. Based on this evidence, we conclude that the district court did not abuse its discretion in denying the officers' Rule 59(a) motion for a new trial on the issue of compensatory damages. *See Poynter ex rel. Poynter*, 874 F.2d at 223.

2.

We next consider the officers' argument that the district court erred in denying their motion for a new trial on damages or for remittitur because the punitive damages award

31

was constitutionally excessive.[5]  They assert that their conduct was not "reprehensible" because they did not cause Hicks physical harm, did not disregard Hicks's health or safety, did not target a financially vulnerable victim, and did not participate in repeated transgressions.  *See United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 375, 388 (4th Cir. 2015) (quoting *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003), which set forth five factors relevant to assessing the degree of reprehensible conduct).  Thus, the officers contend that the evidence did not support the jury's finding that Hicks was entitled to $525,000 in punitive damages.  We disagree.

Punitive damages are available to plaintiffs asserting claims under *Bivens*.  *See Carlson*, 446 U.S at 22.  Such damages are meant to punish the defendant's conduct and to deter future wrongdoing.  *Drakeford*, 792 F.3d at 387 (citing *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001)).  In reviewing an award for punitive damages, courts consider: "(1) the degree of reprehensibility of the defendant's conduct; (2) any disparity between the actual or potential harm suffered by the plaintiff and the amount of the punitive award; and (3) any difference between the award and civil penalties

---

[5] "A punitive damages award is subject to review for compliance with the procedural and substantive constitutional limitations of the Due Process Clause of the Fifth Amendment, lest a grossly excessive award of such damages effect an arbitrary deprivation of property."  *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 376 (4th Cir. 2008); *see also United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 387 (4th Cir. 2015).

that are authorized or imposed in comparable cases." *Fed. Express Corp.*, 513 F.3d at 376 (citing *State Farm*, 538 U.S. at 418).

With these principles in mind, we reject the officers' argument that the punitive damages award was constitutionally excessive. As the district court explained, the officers detained Hicks "unnecessarily and deliberately," "knowing that [Hicks] was an on-duty [S]ecret [S]ervice agent," thereby causing Hicks to miss his assigned security detail. Intensifying the effect of their unlawful seizure, the officers used "abusive language, belittling and demeaning remarks," and demonstrated "spiteful, harassing behavior." And, as the court further observed, Officer Phillips continued his malicious conduct during the unlawful second stop, telling Hicks that he was being "mouthy" and demanding to see Hicks's license, despite knowing that Hicks was a Secret Service agent properly authorized to operate his vehicle. Thus, the record supports the court's determination that the officers acted "with malice" in causing Hicks emotional injury. *See Drakeford*, 792 F.3d at 387 (explaining that whether the conduct involved repeated actions or the harm resulted from malice are relevant factors in assessing reprehensibility); *see also Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 153 (4th Cir. 2008) (concluding that the presence of one *State Farm* factor can justify "a substantial award of punitive damages").

In addition, we observe that the award of punitive damages against each officer was less than three times the amount of the correlating award of compensatory damages. This ratio comports with decisions from the Supreme Court and this Court upholding punitive

damages awards. *See State Farm*, 538 U.S. at 425; *Saunders*, 526 F.3d at 154 (characterizing a single-digit punitive-to-compensatory-damages ratio as "normal").

Because the district court's analysis on the issue of punitive damages was well-reasoned and fully supported by the record, we hold that the court did not err in upholding the punitive damages award. And, based on our determination that the punitive damages award was not constitutionally excessive, we discern no basis for concluding that the district court abused its discretion in refusing to order a new trial or remittitur on the issue of punitive damages. *See Drakeford*, 792 F.3d at 375, 389-90.

IV.

For these reasons, we affirm the district court's denial of the officers' post-trial motions for judgment as a matter of law under Rule 50(b) and for a new trial under Rule 59(a).

*AFFIRMED*